IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PRAGMATUS AV, LLC,  )
 )
Plaintiff,  )
 )
v.  )  Civil Action No. 11-902-LPS-CJB
 )
YAHOO! INC.,  )
 )
Defendant.  )
 )

## REPORT AND RECOMMENDATION

In this action filed by Plaintiff Pragmatus AV, LLC ("Pragmatus" or "Plaintiff") against

Defendant Yahoo! Inc. ("Yahoo!" or "Defendant"), Plaintiff alleges that Yahoo! directly and

indirectly infringes five of Plaintiff's patents (the "Asserted Patents" or the "patents-in-suit").

Presently before the Court is the matter of claim construction. The Court recommends that the

District Court adopt the constructions as set forth below.

## I.   BACKGROUND

### A.   The Parties

Plaintiff is a Virginia limited liability company with its principal place of business in

Alexandria, Virginia. (D.I. 160 at ¶ 1) It is the owner of the patents-in-suit. (*Id.* at ¶ 6-11)

Defendant is a Delaware corporation with its principal place of business in Sunnyvale,

California. (*Id.* at ¶ 2) In the course of its business, Defendant provides the Yahoo! Messenger

product. (*See, e.g., id.* at ¶ 13)

### B.   The Asserted Patents

Each of the Asserted Patents is based on U.S. Appl. No. 08/131,523, which is now U.S.

Patent No. 5,689,641, and all of the Asserted Patents share a common specification. The Asserted Patents are: United States Patent No. 6,237,025 ("the '025 patent"), entitled "Multimedia Collaboration System"; United States Patent No. 6,351,762 ("the '762 patent"), entitled "Method and System For Log-in-Based Video and Multimedia Calls"; United States Patent No. 5,854,893 ("the '893 patent"), entitled "System For Teleferencing In Which Collaboration Types and Participants By Names Or Icons Are Selected By A Participant Of The Teleconference"; United States Patent No. 7,185,054 ("the '054 patent"), entitled "Participant Display and Selection In Video Conference Calls"; and United States Patent No. 5,896,500 ("the '500 patent"), entitled "System For Call Request Which Results In First and Second Call Handle Defining Call State Consisting Of Active Or Hold For Its Respective AV Device." (D.I. 63, exs. 1-5)

The Asserted Patents relate to the field of distributed multimedia collaboration. Specifically, the Asserted Patents disclose systems and methods for utilizing hardware, software and communications technologies "to produce a multimedia collaboration system that greatly facilitates distributed collaboration, in part by replicating the benefits of face-to-face collaboration." (*See, e.g.,* '025 patent, col. 4:49-54)

### C.    Procedural Posture

On October 4, 2011, Pragmatus commenced this action. (D.I. 1) On April 6, 2012, this matter was referred to the Court by Judge Leonard P. Stark to hear and resolve all pretrial matters, up to and including the resolution of case-dispositive motions. (D.I. 32)

On November 13, 2012, the parties filed a Joint Claim Construction Chart in which they identified sixteen disputed terms or term sets. (D.I. 63) The parties filed simultaneous opening

and responsive claim construction briefs on November 29, 2012 and December 21, 2012, respectively. (D.I. 71, 72, 82, 84)  The Court held a *Markman* hearing on January 10, 2013. (D.I. 188, hereinafter "Tr.")  On January 24, 2013, the parties submitted a supplemental joint letter regarding the term "call handle." (D.I. 94)

## II.   STANDARD OF REVIEW

It is well-understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).  The proper construction of claim terms is a question of law for the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  The Court should generally give claim terms their "'ordinary and customary meaning[,]'" which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations omitted).  However, when determining the ordinary meaning of claim terms, the Court should not extract and isolate those terms from the context of the patent, but rather should endeavor to reflect their "meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321.

To that end, the Court should look first and foremost to the language of the claims, because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks and citations omitted).  For example, the context in which a term is used in a claim may be "highly instructive." *Id.* at 1314.  In addition, "[o]ther claims of the patent in

3

question, both asserted and unasserted, can also be valuable" in discerning the meaning of a particular claim term. *Id.* This is "[b]ecause claim terms are normally used consistently throughout the patent, [and so] the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Moreover, "[d]ifferences among claims can also be a useful guide," as when "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

In addition to the words of the claims, the Court should look to other intrinsic evidence. For example, the Court should analyze the patent specification, which "may reveal a special definition given to a claim term . . . that differs from the meaning [that term] would otherwise possess." *Id.* at 1316. In that case, "the inventor's lexicography governs." *Id.* Even if the specification does not contain a special definition of the term at issue, it "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotation marks and citation omitted). That said, however, the specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). In addition to the specification, a court should also consider the patent's prosecution history, if it is in evidence, because it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention[.]" *Phillips*, 415 F.3d at 1317 (citations omitted).

Extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises[,]" can also "shed useful light on the relevant art." *Id.* (internal quotation marks and

citations omitted). Dictionaries (especially technical dictionaries) may be useful in this process because they typically provide "the accepted meanings of terms used in various fields of science and technology[.]" *Id.* at 1318. However, the United States Court of Appeals for the Federal Circuit has cautioned that "heavy reliance on [a] dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Id.* at 1321. Overall, while extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal quotation marks and citations omitted); *accord Markman*, 52 F.3d at 981.

In utilizing these resources during claim construction, courts should keep in mind that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

## III.   DISCUSSION

### A.   Disputed Terms

The parties set out 16 disputed terms or sets of terms for the Court's review. The Court takes up the disputes in the order in which they were argued.

### 1.   "a first and second set of potential participants"

Defendant proposes that this term be construed to mean "[a] first and a second list of potential participants, where the second list is a subset of the first." (D.I. 72 at 14)  Plaintiff, however, argues that this term needs no construction as it "is entitled to its plain and ordinary meaning[.]" (D.I. 71 at 6)  The parties' dispute boils down to whether a definition of this term

should (as Defendant proposes) contain the additional limitation that "the second list is a subset of the first." (Tr. at 11; D.I. 71 at 6)[1]

The Court first looks to the claim language itself. This term appears only in Claim 13 of the '893 patent, which reads:

> A method for conducting a teleconference among a plurality of participants, each having an associated video capture and display and audio capture and reproduction capabilities, the method comprising the steps of:
>> (a) displaying
>>> (i) *a first and a second set of potential participants* in which
>>>> (1) the first set includes names of potential participants and
>>>> (2) the second set includes icons representing potential participants, and
>>> (ii) a set of collaboration types;
>> (b) selecting
>>> (i) one or more participants
>>> (ii) from among a plurality of the displayed sets of potential participants . . . .

('893 patent, col. 43:40-55 (emphasis added)) Although the claim language sets forth other requirements for the sets of potential participants, none of that language requires that the "the second list [must be] a subset of the first."

On the other hand, the language of Claim 14 of the '893 patent (which is dependent on Claim 13) indicates that the term is not as limited as Defendant suggests. Specifically, while a subset limitation does not appear in Claim 13, it does appear in Claim 14, which recites "[t]he method of claim **13**, wherein the second set is a *subset* of the first set . . . ." (*Id.*, col. 43:65-66

---

[1]    The Court notes that, although the term at issue includes the words "potential participants[,]" the parties have a separate dispute about the meaning of "potential participants[,]" which is addressed later in this Report and Recommendation.

(emphasis added))  Thus, as the Federal Circuit has "frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004); *see also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006).

In attempting to overcome this presumption, Defendant points to a passage in the specification that it claims "removes any doubt" as to the correctness of its position: one that, it says "describes the same subset relationship between . . . [the patent's] sole description of two displayed sets of participant information from which a user can select[—]a graphical rolodex and a quick dial list, where the quick dial list is a subset of the graphical rolodex." (D.I. 72 at 15-16) This passage notes that "*[i]n the preferred embodiment . . . [u]*sers can dynamically add new quick-dial buttons by dragging the corresponding entries from the graphical rolodex onto the quick-dial panel." ('893 patent, col. 19:5-10 (emphasis added))  However, a description of a preferred embodiment does not, in and of itself, indicate that an invention can be used only as described in that embodiment. *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003) ("The statements from the description of the preferred embodiment, moreover, are just that—descriptions of a preferred embodiment that operates in a command/response system. Those statements do not indicate that the invention can be used only with a 'command/response' protocol.").

Defendant's most significant argument is that, during the prosecution of the '054 patent (an ancestor of the '893 patent), the applicant limited the invention to directories wherein the second directory is a subset of the first directory. (D.I. 72 at 15)  In support, Defendant points to

7

three of the applicant's statements to the PTO during the prosecution of the '054 patent.

(Yahoo!'s Claim Construction Presentation ("YCCP") at 71, 72 & 74 (citing D.I. 63, ex. 7 at 4, 8 & *id*., ex. 32 at 13); Tr. at 30-32; D.I. 72 at 15)

The Federal Circuit has held that a claim term in a particular patent may be limited by statements made during the prosecution history of a related patent application in at least a few circumstances. First, "[a]s long as the *same claim limitation is at issue*, prosecution disclaimer made on the same limitation in an ancestor application will attach." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003) (emphasis added); *see also Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[T]he doctrine of prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language."). Second, even in the absence of claim limitations that are exactly the same, prosecution disclaimer related to a prior patent application may attach when the claim terms at issue have not been materially altered or are otherwise explicitly linked together in the prosecution history. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979-80 (Fed. Cir. 1999) (finding prosecution history disclaimer related to term "feed tube" in parent patent would attach to term "feed probe" in child patent when the applicant explicitly linked the meaning of the terms during the prosecution of the child patent). The need for this type of clear linkage between the disclaimer in the related application and the patent term at issue is important, because the Federal Circuit has held that "it is permissible for a patentee to take a different approach to claiming an invention in subsequent patents, either by adding limitations or by altering the claims' format[,]" and that "[w]hen the patentee does so . . . we cannot rely on the dubious argument that . . . the applicant's disclaimer with respect to one claim would be equally applicable to another claim."

*Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 944-45 (Fed. Cir. 2013).[2]

Here, the three statements that Defendant points to in the '054 patent's prosecution history were not referencing the same claim limitation as that at issue here, nor were the respective two sets of claim terms immaterially different or otherwise explicitly linked together in the prosecution history. Instead, each of these three statements were directed at permitting allowance of claim language that (at the time) required an explicit "subset" limitation or its equivalent. For instance, the first two statements were made when the claims at issue in the '054 patent application required a "system [that] is configured to (a) display (i) a first and a second directory . . . in which . . . the second directory is a *subset* of the first directory." (D.I. 63, ex. 7 at 11 (emphasis added); *see also id.* at 13-14 ("method comprising the steps of . . . displaying (i) a first and a second directory . . . in which . . . the second directory is a *subset* of the first directory") (emphasis added))  Similarly, the third allegedly disclaiming statement was made when the claims required "(c) a graphical rolodex . . . (d) a quick dial list, listing icons representing video-enabled potential participants *copied from the graphical rolodex* . . . ." (*Id.*, ex. 32 at 2 (emphasis added and omitted) (alterations excluded); *see also id.* at 5)[3]

---

[2]     The Federal Circuit has also applied an applicant's disclaimer in a related patent when the disclaimer was directed to the content of portions of the patents' common specification (as opposed to statements directed to the meaning of particular claim language). *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (finding that the applicant's statement made during prosecution of one related patent was "relevant to an understanding of a common disclosure in the sibling [patents]" where the statement "was expressly directed to the 'communications system' disclosed '[i]n the[] specification'").

[3]     The '054 patent's prosecution history makes clear that the patentee's focus in addressing this issue was on the nature of the particular claim language cited above. In particular, that history shows that the "Examiner . . . rejected [the claims at issue] under 35 U.S.C. § 103(a) as unpatentable over USP 5,195,086 (Baumgartner) in view of Marshak and Rangan . . . ." (D.I. 63, ex. 6 at 6)  In response, the applicant amended the claims and made

In contrast, the claim language at issue in the '893 patent does not include a subset limitation, either explicitly or implicitly. Instead, the claim at issue requires only a method comprising the steps of "(a) displaying (i) *a first and a second set of potential participants* in which (1) the first set includes names of potential participants and (2) the second set includes icons representing potential participants . . . ." ('893 patent, col. 43:40-50)  Indeed, this claim language, at least on its face, appears focused on capturing a concept other than the "subset" concept—that the first and second set of potential participants are displayed utilizing different means. *See Regents of Univ. of Minn.*, 717 F.3d at 944-45 ("[I]t is permissible for a patentee to take a different approach to claiming an invention in subsequent patents, either by adding limitations or by altering the claims' format.").

Therefore, the Court finds that the statements made during the prosecution of the '054 patent are not applicable to the claim term at issue because these purported disclaimers were directed to specific claim terms using different claim language than that at issue in Claim 13 of the '893 patent. *See Ventana*, 473 F.3d at 1182 ("Because claims 1 and 5 of the [child] patent use different claim language [than that used in the parent application]—that is, they do not require that reagent be 'dispensable directly to a sample'—the alleged disclaimer of 'sip and spit'

---

argument as to why *the claims* were allowable. (*See id.* ("Moreover, *the claims* define two directories, one of which is a subset of the other.") (emphasis added); *id.*, ex. 6 at 8 ("Thus, *as claimed in claims 21-41*, the second directory is a subset of the first directory.") (emphasis added); *id.*, ex. 7 at 7-8 ("Independent claims 21 and 30 of the present application explicitly recite that the second directory of video-enabled participants is a subset of the first directory of video-enabled participants."); *id.*, ex. 32 at 13 ("More specifically, *the independent claims* are limited to a teleconference system and method adapted to serve situations where . . . the quick dial list is created by copying from the rolodex . . . .") (emphasis added))  Thus, there can be no suggestion that the three allegedly disclaiming statements in the '054 patent's prosecution history were somehow directed at the common specification of the two patents (as opposed to the relevant claim language). *See Microsoft Corp.*, 357 F.3d at 1349.

10

dispensing during the prosecution of the [parent] application does not apply to the asserted claims of the [child] patent.").

For the foregoing reasons, the Court declines to adopt Defendant's proposed construction that would add an unwarranted limitation to the term at issue. Because the meaning of the term is otherwise clear and unambiguous, the Court finds that the term should be afforded its plain and ordinary meaning.[4] *See Warner Chilcott Co., LLC v. Zydus Pharms. (USA) Inc.*, C.A. No. 11-1105-RGA, 2013 WL 1729383, at *3 (D. Del. Apr. 22, 2013) (finding no reason to read a "'boundary' limitation" into the disputed claim terms and adopting the plain and ordinary meaning of those terms).

### 2. "active states"/"active teleconference"

At the outset, the Court notes that the parties' dispute with respect to these terms was less than clear in the briefing, but crystallized at the *Markman* hearing.

Defendant proposed that these terms be construed to mean "[a] status representing a physical connection between the caller and the callee." (D.I. 63 at 2)  Plaintiff argued that these terms need no construction, as their plain and ordinary meaning (which, Plaintiff says, connotes an "operative[] state or teleconference") should control. (*Id.*; D.I. 71 at 8)  Plaintiff objected to Defendant's proposed addition of the requirement of a "physical connection," claiming that this would be inconsistent with embodiments in the specification describing "'active' teleconferences where *no physical connection* exists between the parties to a teleconference." (D.I. 71 at 8 (emphasis in original); Tr. at 40)

---

[4]  Again, because the phrase "potential participants" is later addressed herein (with the Court recommending a construction for that phrase), the Court here is referring to the meaning of the remainder of the claim term at issue (i.e., "a first and second set of . . .").

In response, Defendant argues that its proposal is not inconsistent with these embodiments, because it focuses on the physical connections that occur at each individual workstation between audiovisual ("AV") devices and communications ports—and not on the connections *between* workstations (which may be wireless or "logical" connections as described in the patent). (Tr. at 39-40) Specifically, Defendant argues that the "specification discloses that each AV device has physical ports that are physically connected, regardless of the type of AV path" between the workstations, and that its "construction accounts for the required call handling and state changes that must occur when a teleconference is active," which "are reflected in the physical connections of the ports at both caller and callee workstations[.]" (D.I. 84 at 12-13)  In other words, Defendant argues that an "active state" or an "active teleconference" refers to a status wherein the AV system has physically switched, connected, or otherwise turned on particular communications ports.

Plaintiff disagrees with Defendant's assertions, although at the *Markman* hearing, it did not provide any additional argument as to why Defendant's interpretation was inappropriate.  But with respect to a related disputed claim term—"controlling communications connections"—Plaintiff argues that communications connections (such as active and hold states) can be controlled by software, as opposed to by a "specific physical switch." (Tr. at 105-06)  Thus, the parties' dispute appears focused on whether an "active state" or an "active teleconference" is a status wherein a communications connection has been physically connected (via the "turning [ ] on and off [of] a specific physical switch") at an individual workstation, (*see* D.I. 84 at 12-13), or a status that can be "performed [for example] by functional software[,]" (Tr. at 105-06).

These terms appear in Claims 11 and 18 of the '500 patent and Claim 17 of the '893

patent. (D.I. 63 at 2)  For instance, Claim 11 of the '500 patent recites:

> A method for conducting a teleconference using a system
> including:
>> a plurality of AV devices, each capable of originating and
>> reproducing audio and video signals,
>> a plurality of communications ports each supporting at least
>> one of the group of switch connections consisting of video
>> in, video out, audio in and audio out; and
>> at least one communication path arranged for transport of
>> audio and video signals,
> the method comprising the steps of
>> (a) controlling communication connections . . .
>> (b) by creating,
>>> (i) as a result of a call request,
>>> (ii) at least a first call handle . . .
>>> (iii) at least a second call handle . . .
>>> (iv) each call handle defining,
>>>> (1) for its respective AV device,
>>>> (2) a call state being at least one of the group
>>>> consisting of *active* and hold *states*, and
>>>> (3) the port switch connections involved in
>>>> the communications connection.

('500 patent, col. 43:39-67 (emphasis added); *see also* '893 patent, col. 44:29 (referencing an

"active teleconference call"))  Neither of the parties cite to the claims as providing evidence that

would resolve this dispute, which is understandable.  The language of Claim 11 indicates that the

claimed method for conducting a teleconference requires a system that includes a plurality of AV

devices (e.g., cameras, monitors, microphones, and speakers), and a plurality of communication

ports.  In addition, the method requires that communications connections are controlled by

creating call handles that "define[] . . . the port switch connections involved in the

communications connection."  But the claim language does not suggest, one way or the other,

whether the port switch connections must be physically connected or switched in order to create

an "active state" or whether the creation of an active state may be effectuated simply by the use of software.

The specification, however, provides some further context. First, as Defendant notes, "[t]he specification describes physical connections at ports and switches." (D.I. 84 at 6 n.4) For instance, the specification describes an "Audio Video Network Manager" ("AVNM"), which "manages A/V Switching Circuitry **30** in FIG. **3** for selectively routing audio/video signals to and from [individual workstations]." ('500 patent, col. 20:41-44; *see also* D.I. 84 at 6 & n.4) The specification goes on to explain that "[i]n response to client program requests, the AVNM provides connectivity between audio/video devices by connecting their ports. Connecting ports is achieved by *switching* one port's *physical input connections* to the other port's physical output connections (for both audio and video) and vice-versa." (*Id.*, col. 20:60-65 (emphasis added))

However, the specification also explains that this connectivity may be accomplished without the need for the switching of physical connections. In this regard, the specification notes that "[g]iven the current state of networking technologies . . . analog methods of carrying real-time audio/video are preferred. In the future, digital methods may be used. Eventually digital audio and video signal paths may be multiplexed with the data signal path as a *common digital stream*[,]" which would eliminate the need for physical switches. (*Id.*, col. 7:5-24 (emphasis added)) Thus, the Court finds it inappropriate to limit the construction of "active states" and "active teleconference" as Defendant proposes. *Accord Collaboration Prop., Inc. v. Tandberg ASA*, No. C 05-01940 MHP, slip op. at 3, 16, 23 (D.I. 182) (N.D. Cal. July 23, 2006) (cited in D.I. 71, ex. B) (in discussing the proposed construction of "central control manager" in a related patent sharing the same specification as the '500 patent, citing to the specification and

14

finding that "in the context of 'AV path,' the claimed invention is not limited to analog AV networks with physical AV switches. Digital AV signals may be transmitted jointly with the data over a packet-switched network, in which case there is no need for dedicated audio and video switching circuitry.").

In light of the Court's resolution of this issue, and because it otherwise does not appear to be disputed that the plain and ordinary meaning of an "active" state or teleconference described in the patents is as Plaintiff suggests (i.e., an "operative" one), (see, e.g., '500 patent, col. 23:31-39; Tr. at 45), the Court finds that these terms should be afforded their plain and ordinary meaning.

### 3.    "addresses of video display devices"

Plaintiff proposes that this term be construed to mean "[n]etwork locations of video display devices." (D.I. 63 at 3) Defendant proposes "[u]nique identifiers of video display devices." (Id.)

The parties generally agree that an "address" must be used to establish communication with a selected participant.[5] They disagree on whether such an "address" must uniquely *identify the user's video display device* or whether an address may simply refer to a *network location* at which a user's video display device resides (one that may be utilized by multiple video display devices).[6]

---

[5]    (See Tr. at 53 (Plaintiff's counsel noting that an "address" is something that "gives the system a notice of where a particular callee would be residing in order to initiate a call"); D.I. 72 at 17 ("Both parties appear to recognize that the addresses of the video display devices are intended to enable communication with those devices."))

[6]    (Compare D.I. 72 at 17-18 ("The dispute between the parties is whether the address of a video display device serves to *identify the device*, as Yahoo! contends, or whether it

The Court turns first to the claim language itself.  The term at issue appears in Claim 33

of the '025 patent, which recites:

> A method for conducting a teleconference among a plurality of
> participants, each having
>> an associated video capture and display and audio capture
>> and reproduction capabilities,
> the method comprising the steps of:
>> (a) maintaining
>>> (i) at least one directory, including
>>>> (1) a list of potential participants; and
>>> (ii) at least one database, including
>>>> (1) *addresses of video display devices*, and
>>> (iii) an association
>>>> (1) between the information in the directory
>>>> and the database
>>>> (2) in which the association is dynamically
>>>> changeable . . .
>> (c) selecting
>>> (i) one or more participants
>>>> (1) from among the displayed participant
>>>> information; and
>> (d) establishing communication
>>> (i) with each selected participant
>>> (ii) using the information in the database.

('025 patent, col. 46:9-33 (emphasis added); D.I. 63 at 3)  At a general level, this claim language

confirms that the "addresses of video display devices" (part of "the information in the database")

is used in "establishing communication" with a "selected participant[.]"  However, it does not

---

is a network location, as Pragmatus contends.  A significant problem with Pragmatus' proposed
construction is that a network location could house multiple video display devices (i.e. several
people in one house or office using computers connected to a single internet signal through a
wireless router).") (emphasis added), *and* D.I. 84 at 14 ("[K]nowing the 'network location' of the
device is not enough to ensure routing of a call to a specific user.  Yahoo!'s construction
provides more, *where each video display device has its own unique identification . . . .*")
(emphasis added), *with* D.I. 82 at 13 ("The primary dispute between the parties is whether the
'addresses' in the '025 patent refer to 'network locations' (Pragmatus' construction) or 'unique
identifiers' (Yahoo!'s construction).""))

clearly resolve the question at hand.

The Court next turns to the specification. The specification does not neatly answer the parties' dispute either, but provides evidence that is more in line with Plaintiff's proposed construction. That is, when the specification refers to a user of a video display device, or to that user's "address," its references tend to suggest a focus on the network "location" of that user; nowhere does the specification clearly indicate that the user's address amounts to the unique identifier of the user's video display device itself.

For instance, in a subsection entitled "Collaborative Multimedia Workstation Software" the specification states that when a user signs in to the collaboration software, the Collaboration Initiator "exchanges initial configuration information with the [AVNM] . . . indicating *the location of the user*, the types of services available on that workstation (e.g., videoconferencing, data conferencing, telephony, etc.) and other relevant initialization information." ('025 patent, col. 18:56-63 (emphasis added))

Additionally, in describing the "basic underlying software-controlled operations occurring for a two-party call[,]" the specification explains that the initiation of a call prompts a caller's Collaboration Initiator to "identify[] the selected user and request[] the *user's address* from Directory Service[.]" (*Id.*, cols. 21:65-22:5 (emphasis added))  In turn, Directory Service "looks up the *callee's address* in the directory database . . . and then returns it to the caller's Collaboration Initiator[.]" (*Id.*, col. 22:5-9 (emphasis added))  With this information, the "caller's Collaboration Initiator sends a request to the AVNM to place a video call to [the] caller with the specified address[.]" (*Id.*, col. 22:10-12)  The AVNM will then "quer[y] the Service Server to find the service instance of type 'video call' whose name corresponds to the *callee's*

17

*address*." (*Id.*, col. 22:12-14 (emphasis added))  Importantly, the specification also notes that

"[t]his service record identifies the *location* of the callee's Collaboration Initiator as well as the

*network* ports that the callee is connected to." (*Id.*, col. 22:14-17 (emphasis added))

This suggestion is further amplified in a section of the specification specifically devoted

to the "Service Server." There the specification explains that the Service Server (or service

database)[7] "keeps track of the *location of client programs* and the types of collaborative sessions

in which they can participate." (*Id.*, col. 21:10-13 (emphasis added))  The specification notes

that the tracking of this information by the Service Server "allows the Collaboration Initiator to

find collaboration participants no matter where they are *located*." (*Id.*, col. 21:13-15 (emphasis

added))

The Court also finds Defendant's primary arguments unpersuasive.  For example,

Defendant argues that an "address" must "identify the device" used by the potential participant

because "[a] simple network location . . . is not sufficient to achieve the stated functions of the

claimed 'addresses.'" (D.I. 72 at 18-19; D.I. 84 at 14 ("Pragmatus' proposed construction fails

because a call cannot be routed to a user based only on 'a network location' for that user."))  It

asserts that "[a] network location . . . may house multiple video display devices, so knowing the

'network location' of the device is not enough to ensure routing of a call to a specific user." (D.I.

84 at 14)  Instead, according to Defendant, only knowing "a unique identifier for each device,"

will "ensure[] that video signals can be routed to each such device." (D.I. 72 at 18)

---

[7]     Plaintiff points out (and Defendant does not appear to dispute) that during the
prosecution history of the '025 patent, the applicant explained that "the contents of [the] claimed
'database,' which includes the 'addresses of video display devices' corresponds to the contents of
the Directory Server 66 as well as *Service Server* 69." (D.I. 71 at 21 (citing D.I. 63, ex. 22 at 22)
(emphasis added))

Yet Defendant cites to no authority (in the patent or otherwise) in support of this assertion. And Plaintiff challenged the assertion—by noting that a preferred embodiment contemplates computers communicating over a local area network using TCP/IP, in which computers not connected to the Internet need not have globally unique Internet Protocol ("IP") addresses. (D.I. 82 at 13 (citing '025 patent, col. 8:19-20)) Defendant never clearly responded to this line of argument from Plaintiff.

Defendant also pointed to a technical dictionary definition of "address" as a basis for its proposed construction. (D.I. 72 at 19; D.I. 84 at 15 ("Yahoo!'s construction is based on a technical dictionary definition . . . ."); Tr. at 56 (Defendant's counsel stating, with respect to this term, "[o]ur definition is based on a technical dictionary.")) This source defines the word "address" as:

> The destination of a message sent through a communications system. A telephone number is considered the Address of the called party on a voice telephone network. In computer terms, it is a set of numbers that uniquely identifies something—a workstation on a LAN, a location in computer memory, a packet of data traveling through a network. Its meaning is similar to that used in reference to postal service.

(D.I. 72, ex. 2 at 32) The Court finds this evidence unpersuasive. For one, the definition does not really resolve the parties' dispute—whether an "address" must identify each *video display device* or whether an address may simply identify the *network location* at which a video display device resides. Second, this definition is not inconsistent with Plaintiff's proposal, as a network location can be said to be a "unique" identifier of a computer's location—just not necessarily one that identifies the particular video display device on which the user resides.

For these reasons, the Court recommends that this term be construed to mean "network

locations of video display devices."

### 4.    "call handle"

Initially, the parties' proposed constructions appeared to raise a number of disputes. However, after hearing each other's arguments at the *Markman* hearing, the parties agreed that they might be able to resolve those disputes. (Tr. at 78-79) The Court therefore ordered the parties to further meet and confer, and to report back on whether agreement could be reached. (*Id.* at 79)

Although the parties were able to make some progress, they were ultimately unable to reach complete agreement on the term's meaning; they submitted a supplemental letter to the Court outlining their current proposed constructions. (D.I. 94) Plaintiff suggests that "call handle" be construed to mean "[t]he primary data structure for managing connections that defines for an AV device, at least its connection status in relationship to a call with at least one other AV device." (*Id.*) Defendant proposes that term be construed to mean "[t]he primary data structure used for managing connections that defines for an AV device, at least the connection status between it and one other AV device." (*Id.*)

Thus, while the parties agree that each AV device has its own call handle, they appear to disagree as to whether a call handle associated with one particular AV device defines, for that AV device, at least "*its*" (the AV device's) "connection status in relationship to a call" or whether it defines at least "*the* connection status *between*" that device and another AV device. In other words, the dispute appears centered around whether a call handle is required to contain only information about the connection status of the AV device with which it is associated, or whether, more broadly, it must contain information regarding the connection status of both the device it is

associated with and another device. (D.I. 71 at 23 (Plaintiff arguing that each "call handle

defines only *'for its respective AV device'* a call state and port switch connections" such that "a

call handle according to claim 11 need only define call states and connection for a single AV

device (i.e., the one it is associated with)" and that the claim language "does *not* require a call

handle to define call states for each AV device in the plurality of AV devices, as proposed by

Yahoo!") (emphasis in original))

     This claim term appears in Claims 11, 12 and 18 of the '500 patent. (D.I. 63 at 3)  Claim

11 (the only independent claim of the above three claims) recites a "method of conducting a

teleconference" comprising the steps of "controlling communication connections . . . between

two . . . AV devices . . . by creating" at least a "first call handle" associated with "one of the two

AV devices" and at least a "second call handle" associated with "the other AV device." ('500

patent, col. 43:39-61) According to this claim, each "call handle define[s] (1) *for its respective*

*AV device*, (2) a call state being at least one of the group consisting of active and hold states, *and*

(3) the port switch connections involved in the communications connection." (*Id.*, col. 43:63-67

(emphasis added)) This language indicates that while a call handle serves a broad purpose (i.e.,

to help control communication connections between two AV devices), it accomplishes this

purpose by defining information related to the connection status of its associated AV device only

(i.e., information regarding a call state and port switch connections).

     This suggestion is reinforced throughout the remainder of the specification. For example,

the term "call handle" is first mentioned in the Abstract of the '500 patent: "The system controls

communications . . . between two of the AV devices by creating a first and second call handles,

respectively associated with the two AV devices. Each call handle defines a call state . . . and *the*

*AV device's* port's switch connections involved in the communication connection." (*Id.*, Abstract (emphasis added))

The specification further notes (in a preferred embodiment of the invention) that the "primary data structure used . . . for managing [communication] connections will be referred to as a callhandle . . . ." (*Id.*, col. 22:58-60) The specification here explains that each end of a communication connection has a call handle associated with it and that these call handles are "comprised of a plurality of bits, including state bits" and "mode bits[,]" which "determine the current state of *the callhandle* and which of a port's four switch connections . . . are involved in a call." (*Id.*, cols. 22:60-23:2 (emphasis added))

Moreover, the specification explains that management of the overall call is accomplished by permitting the clients at each end of the communication to individually manage their respective call handles, which, as described above, only include information associated with that call handle's end of the communication connection. (*Id.*, col. 22:62-66) For instance, when a client wishes to initiate a call, the system will first "create[] a callhandle on the caller's port" and will put *that* callhandle from "idle" to "active." (*Id.*, col. 23:3-10 (internal quotation marks omitted)) The system will "next create[] a callhandle for the callee and send[s] it a call event, which places the callee's callhandle in the 'ringing' state." (*Id.*, col. 23:10-13) "When the *callee accepts the call, its callhandle* is placed in the 'active' state, which *results*" in the communication connection being created. (*Id.*, col. 23:13-15 (emphasis added); *see also id.*, col. 23:57-61 ("If [the callee] accepts the call, these two callhandles become active *and in response thereto*, the [system] set[s] up the appropriate connections" to initiate the call.) (emphasis added))

22

Similarly, when a client wishes to change the state of the overall call, this is "accomplished by controlling the callhandle states." (*Id.*, col. 23:20-24)  For instance, "[t]he placing of [a] currently active call on hold can advantageously be accomplished *by changing the caller's* callhandle from the active state to a 'hold' state, which permits the caller to answer incoming calls or initiate new calls, without releasing the previous call." (*Id.*, col. 23:31-35 (emphasis added))

The prosecution history of the '500 patent provides further evidence that a call handle does not define information related to more than one AV device associated with the overall call. In particular, in responding to an obviousness rejection (of a claim not at issue here), the applicant argued that the claim should not have been rejected as unpatentable in view of the "Hayden" reference, as Hayden's "call appearance defines the status of all participants in a call, not the connection between a device and a port." (D.I. 63, ex. 9 at 14)  The applicant further asserted that "the 'call appearance' of Hayden is not the same as the claimed call handle" because "Hayden's call appearance is, in fact, nothing more than a graphical representation of a single global centralized call state, representing the entire call." (*Id.*)  The applicant thereafter contrasted this with "the claimed call handle mechanism" which, in its view, "provide[d] a decomposed, decentralized call state for independent manipulation and management of separate parts of a call." (*Id.* (noting that "an independent and separate call handle is created for each AV device in a teleconference call"))

Thus, the claims, the remainder of the specification, and the prosecution history all lead to the conclusion that while call handles are used to control communication connections between two AV devices, they do so by defining information related to the connection status of its

23

associated AV device only.[8]   For these reasons, the Court recommends "call handle" be construed to mean "the primary data structure for managing connections that defines for an AV device, at least its connection status in relationship to a call with at least one other AV device."

###   5.   "conducting"

Defendant proposes that the term "conducting" be construed to mean, "[d]irecting the course of, managing, or controlling." (D.I. 63 at 4)  Plaintiff offers no construction, arguing instead that the term should be afforded its plain and ordinary meaning. (*Id.*)

In the parties' briefing, it appeared that their dispute was solely over whether the term must amount to an "active" verb; Plaintiff, for example, argued that Defendant's proposal was flawed because the plain and ordinary meaning of the term is broad enough to include the concept of "act[ing] as a medium for conveying or transmitting." (D.I. 82 at 3)  But at the *Markman* hearing, it became clear that what was driving this dispute was something not captured by the parties' proposals:  whether all aspects of "conducting" a teleconference must be user-directed, or whether "conducting" a teleconference can occur, at least in part, via activity managed by software or a computer system (what Defendant considers to amount to "passive" involvement in a teleconference).  (Tr. at 87-94; *id.* at 92 (Defendant's counsel arguing that "conducting" a teleconference "doesn't involve passive software that is simply there operating" and that what "the dispute comes down to is:  [i]s it an active participation requirement or could it be something more passive?"))

---

[8]      *Accord Collaboration Props., Inc. v. Polycom, Inc.*, No. C-02-4591 MMC, slip op. at 37 (N.D. Cal. Mar. 22, 2004) (cited in D.I. 71, ex. A) (construing the '500 patent's reference to "call handle" to mean, *inter alia*, that "[e]ach call handle is associated with a particular AV device" and is used for determining the *"current state of the call handle"*) (emphasis added).

This term is present in Claim 33 of the '025 patent, Claim 11 of the '500 patent, Claim 10 of the '054 patent, Claim 11 of the '762 patent, and Claim 13 of the '893 patent. The term's use in Claim 33 of the '025 patent is a helpful starting point and representative (at least for purposes of the disputes here) of the way the term is used in other of the patents-in-suit: "A method for *conducting* a teleconference among a plurality of participants, each having . . . the method comprising the steps of: (a) *maintaining* (i) *at least one directory*, including (1) a list of potential participants . . . (b) *displaying* (i) participant information from at least the directory (c) selecting (i) one or more participants . . . (d) establishing communication (i) with each selected participant[.]" ('025 patent, col. 46:9-32 (emphasis added))

The steps of the claimed method appear to describe some limitations that would be performed or managed by a computer system (i.e., what Defendant describes as a "passive" form of "conducting" a teleconference). For instance, the claimed step of "maintaining (i) at least one directory" appears to be performed by a computer system. Similarly, the method step of "displaying (i) participant information from at least the directory" appears to be accomplished simply by a computer displaying participant information on a screen.

Although the term "conducting" does not appear in the remainder of the specification, the steps associated with the term are described therein and align better with Plaintiff's broader understanding of the term's meaning. For example, the specification describes the concept of maintaining a directory by explaining that "*[t]he service database* thus keeps track of the location of client programs and the types of collaborative sessions in which they can participate." (*Id.*, col. 21:10-13 (emphasis added)) Similarly, the concept of displaying participant information is described in the specification as being performed by the Collaboration Initiator,

which is the central component of the Collaborative Multimedia Workstation software. (*Id.*, col. 18:64-6 ("*The Collaboration Initiator* presents a user interface that allows the user to initiate collaborative sessions . . . .") (emphasis added))

For these reasons, the Court finds that the claim language and the specification both suggest that Defendant's construction for the term "conducting" is too narrow, and that the method of "conducting" a teleconference can involve, in part, activity managed by something other than a user (i.e., by software or a computer system). With the Court having resolved that dispute, and because the relevant patent claims otherwise clearly explain what it means to be (and the steps involved in) "conducting" a teleconference, the Court finds that "conducting" should be afforded its plain and ordinary meaning.

### 6.   "controlling communications connections"

With respect to this term, Defendant proposes that the phrase be construed to mean "[m]anaging the physical connection between AV devices by creating [or altering] call handles." (D.I. 72 at 22) Plaintiff opposes Defendant's proposal on the ground that it includes a "physical connection" component; instead, it argues that the term should be given its plain and ordinary meaning. (D.I. 71 at 11-12)

The real dispute as to this term is very similar as to that regarding the terms "active state" and "active teleconference" (the "active terms"). That is, the parties differ over whether controlling communications connections requires the *usage* of or *altering* of *physical connections*, (*see* D.I. 72 at 23-24 (Defendant arguing that certain statements in the specification "confirm that any user can control connections with other users *by altering the physical connections* between their workstations") (emphasis added); Tr. at 97-98), or whether control of

communications may be accomplished by the use of software, and not by the usage of a "specific

physical switch[,]" (Tr. at 105 (Plaintiff's counsel arguing same); *see also* D.I. 84 at 6-7).

This term at issue appears in Claims 11 and 12 of the '500 patent. (D.I. 63 at 5) Similar

to the dispute regarding the active terms, the Court finds that the claim language itself does not

clearly resolve this dispute. Claim 11 simply indicates that the method of conducting a

teleconference at issue involves "controlling communications connections" via the creation of

call handles, which in turn "*define*[] . . . the port switch connections involved in the

communications connection." ('500 patent, col. 43:52-67 (emphasis added)) Nothing in it nor

Claim 12 suggests, one way or the other, whether controlling connections requires the use of or

altering of physical connections.

Again, the specification sheds light on the appropriate resolution. On the one hand, as

was noted above with regard to the active terms, "[t]he specification describes physical

connections at ports and switches[.]" (D.I. 84 at 6 n.4; '500 patent, col. 20:41-44, 60-65)

However, as was also previously noted, the specification explains that this type of connectivity

can also be accomplished without the need for the switching of physical connections. ('500

patent, col. 7:5-24) Thus, the Court finds it inappropriate to limit the construction of "controlling

communications connections" in the manner that Defendant proposes. *Accord Collaboration*

*Prop., Inc.*, slip op. at 3, 16, 23 (cited in D.I. 71, ex. B) (finding, after reviewing the same

specification as that in the '500 patent, that "the claimed invention is not limited to analog AV

networks with physical AV switches").

After taking into account the Court's decision not to import the "physical connection"

requirement that Defendant seeks, it becomes clear that the remainder of Defendant's proposed

construction is simply a reformulation of the words already used in Claim 11, in order to describe

what it means to be "controlling communication connections." Appropriating the remainder of

that proposal, when the claim itself otherwise explains what it means to control communications

connections, is not warranted here. (Tr. at 99-100); *Astute Tech., LLC v. Learners Digest Int'l*

*LLC*, CASE NO. 2:12-CV-689-JRG, 2014 WL 1385191, at *18-19 (E.D. Tex. Apr. 2, 2014)

(finding that a disputed term should be afforded its plain and ordinary meaning, after rejecting

the defendant's attempt to insert a limitation and determining that another part of the defendant's

proposed construction simply "rearrange[d] words from the disputed term itself"). In light of

this, and because the Court's decision above otherwise resolves the one clear dispute between the

parties as to this term, the term's plain and ordinary meaning should control.

### 7.     "displayed in two sets"

Defendant proposes that this term be construed to mean "[s]imultaneously displayed as

two separate lists, where one list is a subset of another list." (D.I. 63 at 5) Plaintiff opposes

Defendant's construction, instead arguing that the plain and ordinary meaning of the term should

be adopted. (*Id.*) In this regard, Plaintiff argues that Defendant's proposal is "faulty" because it

(1) requires "simultaneous display[,]" (2) substitutes "list" for "set" and (3) requires that one

"list" be a "subset" of the other. (D.I. 82 at 9-10 (internal quotation marks omitted)) The Court

will address each criticism in turn.

### a.     "simultaneous display"

With respect to the first criticism, the parties' dispute centers on whether the claims

require that the two sets be displayed simultaneously (as Defendant argues) or whether the claims

simply require that "at some point within the conducting of [a] teleconference, both sets of

participant information must be displayed" (as Plaintiff argues).  (Tr. at 113)

The Court first turns to the claim language, which is helpful in resolving this dispute. Although the claim term at issue appears in Claim 34 of the '025 patent, (D.I. 63 at 6), the Court starts with Claim 33, from which Claim 34 depends.  Claim 33 recites:  "A method for conducting a teleconference" which comprises the steps of "(a) maintaining (i) at least one directory . . . (b) *displaying* (i) participant information from at least the directory . . . (c) selecting (i) one or more participants (1) *from among the displayed participant information*; and (d) establishing communication . . . ."  ('025 patent, col. 46:9-31 (emphasis added))  The language of the claim itself requires a particular order for completion of the method steps.  In particular, the claims require that the "displaying" step occur before and during the "selecting" step.  This conclusion results from the common sense notion that the step of "selecting (i) one or more participants (1) *from among the displayed participant information*" requires that the participant information be first displayed in order for one to "select" from it.

In turn, Claim 34 recites:  "[t]he method of claim **33**, wherein (a) the participant information *is displayed in two sets* in which the second set includes anyone or more of the group consisting of (i) displayed icons and text . . . ."  (*Id.*, col. 46:33-37 (emphasis added))  Although this language, by itself, does not specifically require that the displaying be simultaneous, when considered along with the limitation contained in independent Claim 33, that requirement is clear.  That is, since Claim 33 requires that selecting occur after displaying and from among the *displayed* participant information, and since these requirements apply equally to Claim 34, the claims as written mandate that when the participant information is "displayed in two sets" those two sets must simultaneously be displayed at the time of selection.  (D.I. 84 at 8-9); *see also* 35

29

U.S.C. § 112(d) ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").[9]

Thus, the Court finds that the term "displayed in two sets" should require simultaneous display of the two sets of participant information.

### b.    "list"

With respect to Plaintiff's second criticism—that it is improper to substitute "list" for "set"—Plaintiff's main argument was that the term "list" is narrower than a "set." (D.I. 71 at 13) Plaintiff explained that reference to a "list" would exclude the arrangement of information in "a window with rows of photographic icons" as shown in Fig. 2A of the '025 patent. (*Id.*) Yet in response, Defendant conceded that even this arrangement of information would fall within the specification's description of a "list." (D.I. 84 at 9 (indicating that Fig. 2A of the '024 patent is "expressly called the quick dial *list* or a *list* of quick dial buttons") (emphasis in original))[10]

The purpose of claim construction is to "determin[e] the meaning and scope of the patent

---

[9]    To the extent that Plaintiff argues that the specification discloses an embodiment indicating that simultaneous display is not required, the Court is not persuaded. (*See* D.I. 71 at 12-13; Plaintiff Pragmatus' Markman Presentation ("PPMP") at term 7 at 5) As described above, the claims as written require simultaneous display, and the Court is generally not permitted to re-draft the claims. *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1344 (Fed. Cir. 2009) ("It is likewise well-settled that courts generally may not re-draft claims; we must construe the claims as written."); *see also Chef America Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (refusing to re-write claims that unambiguously required that dough be heated *to* a temperature range of 400° F to 850° F, even though such a construction was contrary to language in the specification indicating that the dough should be heated *at* such a temperature range).

[10]    Moreover, at the *Markman* hearing, the Court asked Plaintiff's counsel to point out any other example that might suggest that a "list" is not the same thing as a "set." (Tr. at 113-14) In response, Plaintiff's counsel seemed to indicate that Plaintiff did not take issue with the use of the term "list" so long as the information in the directory is "displayed in two different sets at some point in time[.]" (*Id.* at 114-15)

claims asserted to be infringed[,]" *Markman*, 52 F.3d at 976, but it is "not an obligatory exercise

in redundancy[,]" *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

Thus, claim construction need be undertaken by a court only if "the parties raise an actual dispute

regarding the proper scope of the[] claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*

*Ltd.*, 521 F.3d 1351, 1360, 1362 (Fed. Cir. 2008). Here, as described above, the Court (even

after full briefing and the *Markman* hearing) is unable to discern any actual dispute between the

parties as to this "set" versus "list" issue. Thus, the Court finds that it is not required to address

the issue and will not recommend a further construction for the word "set." *See Warner Chilcott*

*Co., LLC v. Mylan Inc.*, Civil Action Nos. 11-6844 (JAP), 11-7228(JAP), 2013 WL 3336872, at

*3 (D.N.J. July 2, 2013) ("While each party has taken issue with the others' proposed

constructions . . . and has pointed to alleged flaws in the each of the proffered constructions, no

party has been able to adequately articulate how, based upon the claim term 'tablet,' the meaning

or proper scope of any of the asserted claims is in dispute.").

### c.   "subset"

As with the dispute with respect to the phrase "a first and second set of potential

participants," the parties' final argument here centers on whether one set must be a subset of the

other. (*See* D.I. 71 at 13-14)

Turning first to the claim language, it requires that "the participant information is

displayed in two sets in which the second set includes anyone or more of the group consisting of

(i) displayed icons and text (1) representing potential participants." ('025 patent, col. 46:33-39)

This language includes no statement that one set must be a subset of the other.

However, other claim language indicates that the term at issue includes no subset

31

limitation. For instance, Claim 14 of the '893 patent (which is dependent on Claim 13 of that patent) recites an explicit subset relationship between two sets of participants. ('893 patent, col. 43:65-66 ("wherein the second set is a *subset* of the first set . . . .") (emphasis added)) The presence of this type of restriction in other claims of a related patent indicates that "when the inventor wanted to restrict claims [to a subset relationship,] he did so explicitly." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347-48 (Fed. Cir. 2009).

Moreover, to the extent that Defendant repeats the same specification-related and prosecution history disclaimer-related arguments that it made with respect to the "a first and second set of potential participants" term, (D.I. 72 at 13-14), the Court rejects those arguments for the same reasons as it did previously.

### d.    Conclusion

For the foregoing reasons, the Court recommends that the term "displayed in two sets" be construed to mean "simultaneously displayed in two sets."

### 8.    "initiate"/"initiating"

Defendant proposes that these terms be construed to mean "[c]ause/causing the start of." (D.I. 63 at 6) Plaintiff opposes this proposal, primarily arguing that these terms need no construction as they are written in "simple plain English[.]" (D.I. 71 at 14; Tr. at 145)

This is another example of terms for which the parties' respective proposals really do not address the true nature of their dispute. Both parties do not really disagree that the plain and ordinary meaning of these terms, in the context of the patent, is what Defendant has suggested: that to "initiate" something or to be "initiating" something is to cause or be causing the start of something to occur. (*See, e.g.*, Tr. at 143) The real conflict is over whether the terms'

32

construction must also capture the concept that only a user can "initiate" or be "initiating" steps

of the methods called out in the relevant claims.  Defendant thinks that this is required, at least as

to the terms' use in certain claim steps.  (*Id.* at 142-43; D.I. 84 at 4)  Plaintiff asserts that it is not,

and that either a user or a thing (such as computer software), or both, could initiate or be

initiating the relevant action.  (D.I. 82 at 5-6 (Plaintiff arguing that the claims were "drafted such

that multiple entities could *alternatively* or *independently* perform the claim step") (emphasis in

original))  As this dispute was being discussed at the *Markman* hearing, Plaintiff ultimately

offered an alternative construction that captured its point of view: "[i]nitiating by any entity" or

"by any one person or thing." (Tr. at 145)

> The Court is convinced that the terms "initiate" or "initiating," in and of themselves, do

not require that a user must or must not "initiate" or be "initiating" certain activity; instead, the

terms simply carry their plain and ordinary meaning as set out above.  Who or what can "initiate"

or be "initiating" activity depends on the context in which the instant terms are used in the patent

claims.

> This conclusion is supported by the claim language.  The terms are present in at least

Claim 11 of the '762 patent, and Claims 10 and 17 of the '054 patent.  (D.I. 63 at 6)[11]  With

respect to the '054 patent, the claim language surrounding the terms at issue makes clear that it is

a user (i.e., a teleconference participant) that performs the initiating.  For instance, Claim 10

recites "[a] method for conducting a teleconference . . . (c) allowing *an initiating participant to*

---

[11]    Although not cited in the parties' Joint Claim Construction Chart, the term
"initiate" also appears in Claim 14 of the '500 patent.  (PPMP at term 8 at 1)  The term appears
there very much the same way as it does in Claim 17 of the '054 patent.  (*See* '500 patent, col.
44:35)

*initiate* collaboration by selecting at least one participants listed in at least one of the graphical

rolodex and quick dial list . . . ." ('054 patent, cols. 42:60-43:7 (emphasis added))  Similarly,

Claim 17 recites "[t]he method of Claim **10**, further comprising the steps of:  (a) detecting, (i)

during a first teleconference (1) between a first and a second participant, (ii) an attempt (1) *by a*

*third caller* (2) *to initiate a second teleconference* . . . ." (*Id.*, col. 44:4-13 (emphasis added))

However, with respect to the '762 patent, the claim language is not so limited.  Claim 11

recites "[a] method of conducting a teleconference . . . the method comprising the steps of: . . .

(b) *initiating a call from the first to the second participant* . . . ." ('762 patent, col. 43:1-10

(emphasis added))  Although the claim requires that the call be between a first and a second

participant, there is nothing in the claim mandating that the "initiating" step be caused by a

participant/user, as opposed to by software or a computer system.[12]  (*See also id.*, col. 43:11-16

(claim including additional steps of "capturing participant video images and audio of the first and

second participants" and "carrying AV signals . . . "); Tr. at 142 (Defendant's counsel admitting

that its definition does not "necessarily require individual or user initiation" "[d]epending on the

specific step"))

This conclusion is also supported by the specification.  As both parties noted, the

specification, depending on the context, describes both a participant and a computer system as

the person or thing that can "initiate" or be "initiating" activity.  (D.I. 84 at 4 (Defendant noting

that it "may be true" that "the specification, in some instances, uses the term 'initiate' to describe

---

[12]      *Cf. Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action No. 11-902-LPS-CJB, 2012
WL 6044793, at *11 (D. Del. Nov. 13, 2012) (noting, in resolving motion to dismiss, that the
"initiating" step in Claim 11 "does not explicitly require the participation of Defendant's users")
(citing *Intellect Wireless, Inc. v. T-Mobile USA, Inc.*, 735 F. Supp. 2d 928, 936 (N.D. Ill. 2010)).

situations that do not involve a user")[13]; D.I. 82 at 6 (Plaintiff noting that "the specification is replete with examples of software 'initiating[,]'" and that "there are also passages in the specification that identify a user as an initiator"))[14]

In light of this, the Court finds that the terms should be afforded their plain and ordinary meaning, as set out above.

### 9. "managing a video conference"

The next term in dispute is "managing a video conference." This term appears in Claim 11 of the '762 patent. (D.I. 63 at 6-7) Plaintiff proposes that it be construed to mean "[c]ontrolling the transfer of audio and video signals to and from the workstations associated with the first and second participants." (*Id.*) Defendant proposes that this term be construed to mean "[s]upervising call states and controlling A/V switching circuitry, which selects the appropriate audio and video signals to be transmitted to and from each user's workstation." (*Id.*)

In the briefing, the parties appeared to have a two-fold dispute. First, the parties appeared to disagree about "whether the 'managing' occurs at an individual workstation, as [Defendant] proposes, or whether it happens between the users' workstations, as [Plaintiff] proposes." (D.I. 72 at 19) Second, the parties disagreed as to whether "managing a video conference" requires "supervising call states[,]" "controlling A/V switching circuitry[,]" and "select[ing] the

---

[13]     Indeed, at the *Markman* hearing Defendant noted that one reason why it did not include a "by the user" limitation in its proposed construction was because it wanted to "hold[] true to how the specification uses the claim [terms.]" (Tr. at 132)

[14]     (*Compare* '762 patent, col. 25:7-22 (noting how the "*Collaboration Initiator* then *places an audio/video call to the* [Conference Bridge Manager, or "CBM"] *to initiate* the conference" and discussing "[w]hen *CBM initiates* the call . . .") (emphasis added), *with id.*, col. 21:60 ("When a *caller initiates* a call . . .") (emphasis added))

appropriate audio and video signals[,]" as Defendant proposes. (D.I. 71 at 25-26 (internal quotation marks omitted))

As for the first issue, at the *Markman* hearing, the parties agreed that there was no actual disagreement. (Tr. at 154-55, 168-69; *see also* D.I. 82 at 14-15) However, the second dispute was still live.

As to that second issue, the Court turns first to the claim language. Claim 11 of the '762 patent recites "[a] method of conducting a teleconference among a plurality of participants using workstations with associated monitors for displaying visual images, and with associated AV capture and reproduction capabilities for capturing and reproducing video images and spoken audio of the participants . . . ." ('762 patent, col. 43:1-6)  The specific method steps require, *inter alia*, "(d) capturing participant video images and audio of the first and second participants; (e) carrying AV signals representing the captured video images and spoken audio of the participants along an AV path . . . and (f) *managing a videoconference* during which the video image and spoken audio of the first participant is reproduced at the workstation of the second participant." (*Id.*, col. 43:14-22 (emphasis added))  Other than to verify that the "managing" in question relates to a videoconference of the type described in the claim (i.e., one involving the manipulation of a video image and spoken audio of a participant between two participant workstations), the claim language itself does not do much to further the resolution of this dispute.

The specification, however, is helpful.  First, in a subsection entitled "Collaborative Multimedia Workstation Software[,]" the specification describes "software modules . . . allow[ing] the user to initiate and *manage* (in conjunction with the server software) videoconferencing . . . ." (*Id.*, col. 18:30-36 (emphasis added))  The specification later notes that

36

the "central component of the Collaborative Multimedia Workstation software is the

Collaboration Initiator **161**." (*Id.*, col. 18:47-48)  It goes on to describe the use of the

Collaboration Initiator, noting that it presents a user interface from which a user may initiate

collaborative sessions by selecting a session participant. (*Id.*, col. 18:58-63)

Once a user selects a participant, the Collaboration Initiator first retrieves address

information regarding that participant and then "[i]n the case of a videoconference call, . . .

communicates with the AVNM (*as described in greater detail below*) to set up the necessary data

structures and *manage the various states of that call, and to control A/V Switching Circuitry **30**,*

*which selects the appropriate audio and video signals to be transmitted to/from each*

*participant's [workstation]*." (*Id.*, col. 19:23-32 (emphasis added))

As indicated above, the specification later further describes the management of a

teleconference:

> As has been descried previously, the AVNM *manages the switches*
> *in the A/V Switching Circuitry* **30** in FIG. **3** to provide port-to-port
> connections in response to connection requests from clients. The
> primary data structure used by the AVNM for *managing* these
> connections will be referred to as a callhandle, which is comprised
> of a plurality of bits, including state bits.
>
> Each port-to-port connection managed by the AVNM comprises
> two callhandles, one associated with each end of the connection.
> The callhandle at the client port of the connection permits the client
> to *manage* the client's end of the connection. The callhandle mode
> bits determine the current state of the callhandle and *which of a*
> *port's four switch connections (video in, video out, audio in, audio*
> *out) are involved in a call.*

(*Id.*, col. 22:47-61 (emphasis added))

Thus, one disclosed embodiment appears to require that managing a videoconference

involves the limitations suggested by Defendant—"supervising call states[,]" "controlling A/V switching circuitry[,]" and "select[ing] the appropriate audio and video signals[.]" But the specification also takes pains to note that this is simply a "preferred embodiment" and that "[t]he AVNM may provide for managing connections among [workstations] and other multimedia resources for audio/video/data communications *in various ways*." (*Id.*, col. 22:42-46 (emphasis added)) As such, the specification alerts the reader that there can be other "ways" of "managing" a videoconference—ways that may not include the use of the limitations suggested by Defendant. *See Northrop Grumman Corp.*, 325 F.3d at 1355.

In particular, with respect to the "controlling A/V switching circuitry" and "select[ing] the appropriate audio and video signals" limitations, the specification describes an alternative embodiment not requiring such limitations. In this embodiment, described previously in the Court's discussion of the active terms, "digital methods may be used to" multiplex the digital audio and video signal paths with the data signal path to create a *"common digital stream."* ('762 patent, col. 7:8-11 (emphasis added)) Thus, the specification discloses an embodiment where there is no need for A/V switching circuitry or selecting appropriate audio and video signals because the information is handled in a common digital stream.

For these reasons, the Court recommends that "managing a videoconference" be construed to mean "controlling the transfer of audio and video signals to and from the workstations associated with the first and second participants."

### 10. "potential participants"

The next disputed claim term is "potential participants." This term appears in Claims 33, 34, and 38 of the '025 patent; Claims 10, 11, and 16 of the '054 patent; and Clams 13, 14, and 17

of the '893 patent. (D.I. 63 at 7)

Defendant proposes that this term be construed to mean "[u]sers with workstations that have video capture and display and audio capture and reproduction capabilities, and at which a video or audio connection request from another user's workstation can be accepted." (*Id.*) Plaintiff opposes this construction, instead arguing that the plain and ordinary meaning of the term should control. (D.I. 71 at 15) In its briefing, Plaintiff suggested that this meaning would capture "one who might participate in a teleconference[,]" (*id.*), or "someone who might participate in a teleconference regardless of his or her *present* capabilities[,]" (D.I. 82 at 7 (emphasis in original)). At the *Markman* hearing, it became clear that the dispute was over whether "potential participants": (1) must be signed in to a workstation (i.e., be online) that (2) has video capabilities.[15] (Tr. at 174-75, 181, 183, 187, 189, 192) The issues here are difficult, and the Court will address each one in turn.

### a.   Online participant

Turning first to the claim language, the Court finds that the best reading of the claim term does not require that "potential participants" must be *presently* ready to have a teleconference—that is, that they must be online. The Court acknowledges the initial appeal of Defendant's main argument, which focuses on the last step of each of the independent claims at

---

[15]      There also appeared to be a dispute as to Defendant's use of the term "workstation(s)" in its proposal. Plaintiff objected to this as an attempt to "possibly exclude portable computers" from the scope of the claims. (Tr. at 193) Defendant did not indicate that this was its intention, nor did it otherwise respond to Plaintiff's criticism. In light of that, and in light of the clear disclosure in the specification of "personal computers and workstations[,]" (*see, e.g.*, '025 patent, col. 15:13-14), and "laptops[,]" (*id.*, col. 38:52-60), the Court finds the use of the term "workstations" would be inappropriately limiting and will utilize a construction that addresses that issue.

issue, a step that requires the *establishment* of a connection with a "selected participant[.]" (*See, e.g.*, '025 patent, col. 46:30-32 ("(d) establishing communication (i) with each selected participant (ii) using information in the database")) The argument goes that since the claims require that this "participant" is selected from a displayed list of "potential participants[,]" (*id.*, col. 46:15-28), and since the claims require that a participant "establish[] communication" with another, then "potential participants" must also be online so that they are able to (if selected) be a part of an established communication with another. (Tr. at 175-76)

However, the Court also recognizes that the claims use different terms here—"potential participants" and "participant(s)"—emphasizing that the two terms do not mean precisely the same thing. ('025 patent, col. 46:15-32; D.I. 82 at 6) The question, then, is whether one's status as a "potential" participant means more than just that the potential participant is a participant who has not yet been selected (and if so, whether it implicates the particular limitations suggested by Defendant). The specification adds to this analysis, as it discloses an embodiment suggesting that a person need not be logged into a workstation in order to appear on a list of potential participants. The specification notes:

> When a caller initiates a call (e.g., by selecting a user from the graphical rolodex and clicking the call button or by double-clicking the face icon of the callee on the quick-dial panel), the caller's Collaboration Initiator responds by identifying the selected user and requesting that user's address from Directory Service . . . and then returns it to the caller's Collaboration Initiator . . . . The caller's Collaboration Initiator sends a request to the AVNM to place a video call to caller with the specified address . . . . The AVNM queries the Service Server to find the service instance of type "video call" whose name corresponds to the callee's address. This service record identifies the location of the callee's Collaboration Initiator as well as the network ports that the callee is connected to. *If no service instance is found for the callee, the AVNM notifies the caller*

*that the callee is not logged in.*

('025 patent, cols. 21:67-22:17 (emphasis added))

Therefore, the Court finds that the best way to reconcile the claim language and the specification's disclosure is to acknowledge that while a "participant" must be online (so that he is a part of an established communication with another user), "potential participants" *could be* individuals who are not logged in and not online.

### b.    Video-capable

The next issue relates to whether "potential participants" must have video capability. The preambles of each of the independent claims above are similar, and they could be read to suggest that at least as to a "participant" in a teleconference, that person is required to have video capabilities. For instance, the preamble of Claim 33 of the '025 patent recites: "A method for conducting a teleconference among a plurality of *participants, each having an associated video capture and display and audio capture and reproduction capabilities* . . . ." ('025 patent, col. 46:9-12 (emphasis added))  The preamble of a claim term is not necessarily limiting, however, and determining whether it is or is not is a context-specific endeavor. *See, e.g., Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir. 2002).  Defendant does not make specific argument as to why the preamble should be considered limiting here.  And in any event, to the extent the preamble describes capabilities of individuals, it refers to those of "participants" and not "potential participants."

And when it comes to "potential participants," a comparison between the claims of the '054 patent and the claims of the '025 and '893 patents strongly suggests that not every "potential" participant needs to be video-enabled.  In particular, while the claims of the '025 and '893 patents

41

recite "potential participants[,]" (*see, e.g.*, '025 patent, col. 46:16 ("a list of potential

participants")), the claims of the '054 patent explicitly recite lists of "*video-enabled* potential

participants[,]" (*see, e.g.*, '054 patent, col. 42:67 (emphasis added)). There would seem to be

little reason for the patentee to describe "video-enabled potential participants" in the '054 patent

if being "video-enabled" was an essential characteristic of what it means to be "potential

participants" as the term is used in any of the patents. *Cf. Nystrom v. TREX Co., Inc.*, 424 F.3d

1136, 1143 (Fed. Cir. 2005) ("When different words or phrases are used in separate claims, a

difference in meaning is presumed.") (citing *Tandon Corp. v. United States Int'l Trade Comm'n*,

831 F.2d 1017, 1023 (Fed. Cir. 1987)).

Moreover, the specification also suggests that, even as to "participants" in a

teleconference, not all participants need to be video-enabled. For instance, in the "Summary of

the Invention" section, the specification discloses that, in a preferred embodiment of the

invention:

> The system architecture also accommodates the situation in which
> the user's desktop computing and/or communications equipment
> provides *varying levels of media-handling capability*. For example,
> a collaboration session—whether real-time or asynchronous—may
> include participants whose equipment provides capabilities ranging
> from *audio only* (a telephone) . . . to a full complement of real-time,
> high-fidelity audio and full-motion video, and high-speed data
> network facilities.

('025 patent, col. 5:31-39 (emphasis added); Tr. at 180 (Defendant's counsel noting that the

specification "says you can have audio and/or video and that's what a teleconference means")) In

light of this evidence, the Court finds it inappropriate to require that "potential participants" be

video-capable.

### c.    Conclusion

For the foregoing reasons, the Court recommends that the term "potential participants" be construed to mean "users with workstations or portable computers who might participate in a teleconference."

### 11.    "quick dial list"

The term "quick dial list" appears in Claims 10, 11, and 12 of the '054 patent. (D.I. 63 at 8) Plaintiff argues that the term should be construed to mean "[a] second list of potential participants from which a collaboration session can be initiated." (*Id.*) Defendant proposes "[a] list of entries of potential participants that is a subset of and separate from the graphical rolodex." (*Id.*)

These competing proposals implicate two disputes. The first has to do with Defendant's reference to a "subset" and relates to whether a "quick dial list" must be a "subset" of the graphical rolodex. The second dispute centers around Defendant's "separate from" language; it appears to be about not whether the quick dial list and the graphical rolodex *are* two different lists, but whether these two different lists must be "[p]hysically different lists that appear . . . on the screen[,]" (Tr. at 213), such that, as Plaintiff's counsel put it, the lists "have to be *in different places* or *in different windows* [i.e., were an embodiment using Windows-based technology]," (*id.* at 198-99 (emphasis added)).

With respect to the first dispute, while the claim language and the remainder of the specification provide fodder for both sides, the Court finds that the prosecution history is dispositive of the issue.

During the prosecution of the '054 patent, in response to an office action rejecting the

claims, the applicant amended the claims and provided argument as to why the amendments

made the claims patentable.  The applicant amended what is now independent Claim 10 to recite:

"A method for conducting a teleconference . . . (b) displaying a quick dial list on the participant's

video display device and listing icons representing video-enabled potential participants copied

from the graphical rolodex[.]"  (D.I. 63, ex. 32 at 5 (alterations excluded); *see also* '054 patent,

cols. 42:60-43:4 (same))  In arguing that such claims were patentably distinct over the recited

prior art, the applicants noted that "*[t]he prior art does not teach or suggest two separate*

*participant listings, displayed to a call originating participant, where the information in one*

*listing is copied from the other directory but is of a different type.*"  (*Id.*, ex. 32 at 13 (emphasis

in original))  In contrast, the applicant specifically stated that "the *independent claims are limited*

to a teleconference system and method adapted to serve situations where[, *inter alia*,] . . . *the*

*quick dial list is created by copying from the rolodex*[.]"  (*Id.* (certain emphasis added))  Thus,

the applicant clearly and unmistakably limited itself to methods where "the quick dial list is

created by copying from the rolodex"—such that whatever the content of the quick dial list, it

necessarily only includes certain information found in (and copied from) the graphical rolodex.

        As for the second dispute—whether the lists must be physically "separate" (such that they

are in different places or different windows on a computer screen)—the Court turns first to the

claim language.  Claim 10 of the '054 patent recites, *inter alia*, "(a) displaying a graphical

rolodex on a participant's video display device, including a scrollable listing of entries of video-

enabled potential participants; (b) displaying a quick dial list on the participant's video display

device and listing icons representing video-enabled potential participants copied from the

graphical rolodex . . . ."  ('054 patent, cols. 42:65-43:4)  While the claims use two separate

44

method steps to recite the displaying of these lists, there is no absolute indication that the lists must be displayed in separate places or in separate windows.  In other words, the claim steps could be met by displaying the two different lists in the same window.

The specification also does not appear to *require* that the two lists be so separate.  For one, much of the discussion of the quick-dial list in the specification is unhelpful in resolving this dispute, because it is primarily focused on describing the *creation* of the quick-dial list as opposed to how the list must be *displayed* in relation to the graphical rolodex: "In the preferred embodiment . . . [u]sers can dynamically add new quick-dial buttons by dragging the corresponding entries from the graphical rolodex onto the quick-dial panel." (*Id.*, cols. 18:63-19:3-5)

The specification's reference to Figure 2A is instructive, however.  While Figure 2A does display the graphical rolodex (displayed in the top right corner window) separately from the quick dial list (displayed in the bottom right corner window), (*see also id.*, col. 19:6-15), the specification makes clear that this figure merely illustrates the "user interface displays that appear on *typical* CMW screens which may be generated during operation of *a preferred embodiment* of the invention[,]" (*id.*, cols. 2:66-3:4 (emphasis added)).  "Absent some clear intent to the contrary, th[e] court does not import examples from the specification into the claims." *In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1372 (Fed. Cir. 2007).

For these reasons, the Court recommends that this term be construed to mean "a list of entries of potential participants that is a subset of the graphical rolodex."

### 12.   "selecting"/"selected"

Defendant proposes that these terms be construed to mean "[p]rovided/providing an input

designating a choice through a keyboard or a mouse." (D.I. 63 at 9)  Plaintiff opposes this

construction, instead arguing that these terms be given their plain and ordinary meaning.  The

parties' arguments reveal two disputes:  (1) whether "selecting" must be done by a user; and (2)

whether "selecting" should be limited to selection through use of a keyboard or a mouse.  (Tr. at

222-23)  The Court addresses each issue in turn.

### a.   Selection by a user

These terms appear in Claims 33, 35, and 38 of the '025 patent; Claims 10, 12, 13, and 16

of the '054 patent; and Claims 13, 14, and 17 of the '893 patent.  (D.I. 63 at 9)  Having now

reviewed all of the evidence and argument presented up through the *Markman* hearing, the Court

finds that although these claims use the terms slightly differently, the conclusion to be drawn

from the differing claim language is the same—that a user performs the act of "selecting" as to

these claims.

For instance, Claim 33 of the '025 patent recites:  "A method for conducting a

teleconference . . . comprising the steps of . . . (b) *displaying* (i) participant information from at

least the directory[;] (c) *selecting* (i) one or more participants (1) *from among the displayed*

participant information . . . ."  ('025 patent, col. 46:9-29 (emphasis added))  The claim thus

requires, by use of the term "displaying," that the participant information be made visible for a

user to see.  (*See* Tr. at 227 (Plaintiff's counsel agreeing that "display" means to make "visible"))

It is from *this* displayed information that the "selecting" in question must occur.  As a result, the

claims suggest that "selecting" is being done by a user, because only the user (and not, for

example, software or a computer system) has the information "displayed" to him before he

makes a choice in "selecting" a participant.[16] (D.I. 72 at 8); *cf. Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action No. 11-902-LPS-CJB, 2012 WL 6044793, at *9-10 (D. Del. Nov. 13, 2012) (noting that it "may well be" that "users must do the 'selecting'" with regard to the claims of the patents-in-suit, and that this was a "persuasive argument" made by Defendant, but determining that claim construction was the appropriate time to construe the meaning of the "'selecting'" terms).

Similarly, Claim 10 of the '054 patent recites: "(a) displaying a graphical rolodex . . . (b) displaying a quick dial list . . . (c) allowing *an initiating participant* to initiate collaboration by *selecting* at least one participants *listed in at least one of the graphical rolodex and quick dial list* . . . ." ('054 patent, cols. 42:65-43:7 (emphasis added)) Although the term is used within a claim step that requires "allowing" something to occur, that does not change the fact that what must be allowed is "selecting" by "an initiating participant" of information from the graphical rolodex or quick dial list. Thus, the term's use in the claims suggest that a user performs the act of "selecting."

The suggestion that a *user* selects from displayed participant information is further confirmed in the specification, which, in this context, uniformly refers to selection of participants by a user. For instance, the specification describes that "[t]he Collaboration Initiator presents a user interface that allows the user to initiate collaborative sessions . . . . In the preferred

---

[16]     This term is used similarly in the asserted claims of the '893 patent. For instance, Claim 13 of that patent recites: "(a) displaying (i) a first and a second set of potential participants . . . (ii) a set of collaboration types; (b) *selecting* (i) one or more participants (ii) *from among* a plurality of *the displayed sets of potential participants*; (c) *selecting* (i) a desired collaboration type (ii) *from among* a plurality of *the displayed collaboration types* . . . ." ('893 patent, col. 43:45-60 (emphasis added)) Thus, the claim language of the '893 patent also suggests that selecting is performed by a user.

embodiment, session participants can be *selected from a graphical rolodex . . . or from a list of quick-dial buttons*[.]" ('025 patent, cols. 18:64-19:2 (emphasis added)) The specification goes on to state that "[o]nce the user elects to initiate a collaborative session, *he or she selects* one or more desired participants by, for example, clicking on that name to *select* the desired participant *from the system rolodex or a personal rolodex . . . .*" (*Id.*, col. 19:9-14 (emphasis added))[17]

As all of the foregoing suggests, the Court finds that the claim language and remainder of the specification support Defendant's proposal in this regard. In opposing this conclusion Plaintiff makes two arguments, which are ultimately unavailing.

First, relying most explicitly on *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1368-69 (Fed. Cir. 2012), Plaintiff argues that "[w]hen a claim does not expressly require that a user perform a step, it is improper to import such a limitation, particularly where multiple entities could *alternatively* or *independently* perform the claimed step." (D.I. 71 at 17 (emphasis in original)) In *Meyer*, the claims at issue "disclose[d] four steps: (1) providing a container that has a height to diameter aspect ratio of 2:1; (2) pouring liquid (*e.g.*, milk) into the container; (3) introducing a plunger that includes at least a rod and plunger body with a screen; and (4) pumping the plunger to aerate the liquid." *Meyer*, 690 F.3d at 1359-60. In finding that the

---

[17]     In addition, the Court notes the title of the '893 patent: "System For Teleconferencing In Which Collaboration Types And Participants By Names Or Icons Are *Selected By A Participant Of The Teleconference*[.]" Those words amount to additional support for the conclusion that it is a user who selects from a list of participants. *See, e.g., Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (interpreting claims to cover a product containing certain ingredients where the title of the patent recited "Lubricating Oil Compositions *Containing* Ashless Dispersant [ZDDP], Metal Detergent and a Copper Compound") (emphasis in original); *Pharmacia & Upjohn Co. v. Sicor Inc.*, 447 F. Supp. 2d 363, 369 (D. Del. 2006) (relying in part on title of patent in construing claim term); *cf. Pragmatus AV, LLC*, 2012 WL 6044793, at *9.

"providing" claim step could be performed by either the manufacturer or the end user, the

Federal Circuit noted that "[a]fter careful review of the intrinsic evidence, we find that *nothing in*

*the claim language or the patent specification* limits the 'providing' step to a specific party." *Id.*

at 1369 (emphasis added). This is in contrast to the situation here, where the Court has found

that there is significant evidence in the claim language (and the specification) to support the

assertion that "selecting" must be done by a user.

Plaintiff also points to portions of the specification that, in its view, indicate that

"selecting" may be performed by software. (D.I. 71 at 16-17 & n. 12-14) For instance, Plaintiff

references a portion of the specification describing how the Collaboration Initiator in conjunction

with the AVNM manages a call: "In the case of a videoconference call, the Collaboration

Initiator then communicates with the AVNM . . . to set up the necessary data structures and

manage the various call states of that call, and to control *A/V Switching Circuitry, which selects*

the *appropriate audio and video signals to be transmitted* to/from each participant's CMW."

(D.I. 71 at 16-17 & n. 14 (citing '893 patent, col. 19:34-40) (emphasis in original)) However, this

portion of the specification (as are all of the others referenced by Plaintiff in this regard) is

inapposite, as it describes a "selecting" step that is not recited in the claims at issue (i.e.,

selection of certain signals *after* the participants have been "selected," as opposed to selection *of*

the participants).[18] (D.I. 84 at 3-4) While as a general matter, software may be able to "select"

something, in the context of these claims at issue, "selecting" must be done by a user.

**b.    Selection through use of a keyboard or a mouse**

---

[18]    Indeed, even Plaintiff's counsel admitted that these examples "are not reflective of
the type of selecting that's being called out in [the instant] claims[.]" (Tr. at 229)

As for the second dispute, as can be seen from the recitation of the claim language above, there is nothing in the claims that suggests one way or the other *the means* by which "selecting" must occur.

However, the specification does indicate that selection may be accomplished by broader means than Defendant proposes. While it is true that the specification specifically describes how a user may select a desired participant by "clicking on" that participant's name, it also notes that this is merely an exemplary embodiment. (*See* '025 patent, col. 19:9-28 ("he or she selects one or more desired participants by, *for example*, clicking on that name . . . .") (emphasis added)) Moreover, the specification notes that standard components of "currently available personal computers" (which may be adapted to perform the invention) "include the display monitor **200**, keyboard **300** and mouse *or tablet (or other pointing device)* **400** . . . ." (*Id.*, col. 15:13-18 (emphasis added)) Because the specification indicates that the means of selection need not be as limited as Defendant proposes, the Court finds that it is inappropriate to import this limitation into the claims.

### c.    Conclusion

For these reasons, the Court recommends that "selecting" be construed to mean "providing by a user a choice of" and that "selected" be construed to mean "user-chosen."

### 13.    "teleconference"

Plaintiff proposes that this term be construed to mean "[a] communication session that includes real-time audio, video and/or data conferencing." (D.I. 82 at 2 & n.5; *see also* Tr. at 235) Defendant proposes "[a]udio and/or synchronized video communication that is real-time and bidirectional between two or more workstations." (D.I. 72 at 4) While the parties initially

appeared to have many disputes, through the briefing process and at the *Markman* hearing, that

number appeared to collapse into one: whether a "teleconference" can be a data-only

communication, or whether it must include at least real-time audio or video conferencing.

For one, although the parties discussed Defendant's inclusion of the term "synchronized"

in its proposal, it later became clear that Plaintiff's objection to this term was moot. Specifically,

Plaintiff objected because the specification notes that collaboration sessions can be "real-time

[or] asynchronous." ('025 patent, col. 5:31-40; *id.*, col. 18:64-66; *see also* Tr. at 233) In

response, Defendant stated that it had included the term to get at the concept that when a

teleconference has "audio *and* video *together*, [the two must] be synchronized." (Tr. at 240

(emphasis added)) Thus, Defendant's counsel stated that Plaintiff's objection (and the portions

of the specification highlighted by Plaintiff) were directed at a different issue—whether the

collaboration sessions themselves could be asynchronous—and that Defendant's proposal was

not intended to exclude that concept. (*Id.* at 240-41) In light of this, the Court cannot discern an

actual dispute with regard to this term.

Similarly, as to Plaintiff's objection to "bidirectional," the *Markman* hearing revealed that

there was not an actual dispute. Plaintiff noted that it was unclear to it why Defendant included

the term; it objected to the extent that it would require that all participants contribute to the

teleconference (i.e., talk on the teleconference). (*Id.* at 234-35) In response, Defendant clarified

that it was not including this additional limitation to require this. (*Id.* at 242-43)[19]

---

[19]     Plaintiff also objected to Defendant's inclusion of the term "workstation[s][,]" as,
in its view, such a term would exclude "laptops." (Tr. at 235) For the reasons set forth
previously, *see supra* n.15, the Court finds the use of the term "workstations" inappropriately
limiting and will recommend a construction that reflects this conclusion.

Thus, the main dispute remaining was whether the term "teleconference" could

incorporate "data-only communications" (as Plaintiff proposes) or whether a teleconference must

include at least audio or video communication (as Defendant proposes). (*Id.* at 232, 236-39, 244;

D.I. 72 at 4-5)

The term at issue appears in a number of asserted claims. (D.I. 63 at 9)  For instance,

Claim 33 of the '025 patent recites "[a] method for conducting a *teleconference . . . .*" ('025

patent, col. 46:9-10 (emphasis added))  Claim 35, which is dependent on Claim 33, further

recites that the method of Claim 33 comprises the additional steps of: "(a) selecting *a*

communication type, (i) from a displayed set of communication types; and (b) establishing

communication (i) of the selected type, (ii) with each selected participant." (*Id.*, col. 46:39-46

(emphasis added))  Claim 36, which is dependent on Claim 35, further recites that "the set of

communication types include[] *at least one of:* (i) *data conferencing, videoconferencing,*

*telephone conferencing,* sending faxes, sending electronic mail and sending multimedia mail

messages." (*Id.*, col. 46:47-52 (emphasis added); *see also* '054 patent, cols. 42:60-43:38 (Claim

14—a claim dependant on Claim 10, which addresses a "method of conducting a

*teleconference*"—reciting a method wherein "the communication types include[] *at least one of*

*data conferencing, videoconferencing, telephone conferencing,* real-time text sending faxes,

sending electronic mail and sending multimedia mail messages") (emphasis added))  Thus, the

claims themselves could be read to suggest that a teleconference may be a data-only

communication.

However, even assuming that a data-only communication is part of the ordinary meaning

of teleconference, that term may be defined more restrictively if the intrinsic record "redefin[es]

[it] or . . . characteriz[es] the invention . . . using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Both parties point to one passage in the specification, which they argue constitutes an express definition of "teleconference." (Tr. at 232, 237-38) In the "Summary of the Invention[,]" the specification states: "*[a]s used herein*, desk-top *teleconferencing includes* real-time audio *and/or* video teleconferencing, as well as data conferencing[.]*" ('025 patent, col. 4:58-60 (emphasis added)) The Court finds that this statement provides reasonable clarity, deliberateness and precision sufficient to narrow the term "teleconference" to include at least real-time audio and/or video teleconferencing.[20] The reference clearly states that "teleconferencing" includes audio "and/or" video teleconferencing—it can include one "and" the other, or it can include one "or" the other, but it has to include at least one of the two.

For these reasons the Court recommends that the term "teleconference" be construed to mean "communication session that includes real-time audio and/or video conferencing."

### 14.   "on hold"/"hold state"

Defendant proposes that "on hold"/"hold state" be construed to mean "[o]n temporary

---

[20]     *Compare Jazz Pharms., Inc. v. Roxane Labs., Inc.*, Civil Action No. 10-6108 (ES), 2012 WL 4103880, at *4 (D.N.J. Sept. 14, 2012) ("The 'as used herein' language leading into the definition . . . indicates that the patentee became his own lexicographer, and therefore the full definition . . . should be used."), *and Papyrus Tech. Corp. v. New York Stock Exch., Inc.*, 581 F. Supp. 2d 502, 515-16 (S.D.N.Y. 2008) (finding that a patentee acted as his own lexicographer when he stated that "*As used herein*, 'status' refers to . . .") (emphasis added) (internal quotation marks and citation omitted), *aff'd* 396 F. App'x 702 (Fed. Cir. 2010), *with Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354-55 (Fed. Cir. 2003) (refusing to find that a passage beginning "[a]s used herein" limited the claims because the passage did not "provide reasonable clarity, deliberateness, and precision sufficient to narrow the definition of the claim term" because it set out two conflicting definitions of the term).

suspension from the teleconference without disconnecting." (D.I. 72 at 27)  For its part, Plaintiff

opposes this construction on the grounds that it introduces "temporary suspension" and "without

disconnecting" limitations; it argues that the claim terms at issue should be afforded their plain

and ordinary meaning.  (D.I. 71 at 17-18; D.I. 82 at 19)  However, in its briefing, Plaintiff never

explained its rationale for its objections or otherwise described how the plain and ordinary

meaning of the terms would be broader than Defendant's proposal.[21]

    At the *Markman* hearing, Plaintiff crystallized its objections (or lack thereof).  For one,

with respect to its initial concern with the "temporary suspension" limitation, it became apparent

that Plaintiff had no clear objection.  (Tr. at 251 (Plaintiff's counsel noting that "[w]e're not

necessarily disputing that when you're on hold there's a temporary suspension[,]" but that

Plaintiff was "leery" because this additional limitation could "cause some confusion"))

    With respect to the proposed "without disconnecting" limitation, Plaintiff stated that its

opposition came because this appeared to be an attempt to exclude, *inter alia*, the wireless

communication embodiment.  (*Id.*)  In that regard, Plaintiff noted that "to the extent that

[D]efendant [is] representing that they're not requiring this disconnect to require an actual

physical disconnection, we don't really have a problem."  (*Id.* at 254)  For its part, Defendant

confirmed that it was not attempting to import a physical connection requirement into the claims,

noting "[t]he session is live, but that doesn't mean that you have to be *physically connected* to

one another.  Again, we wouldn't want to, in some way, exclude a *wireless embodiment*."  (*Id.*

---

[21]    Indeed, Plaintiff's argument that the specification "describes the hold state as
one in which the 'communication with the participant on hold is not released . . .' so that 'a call
on hold can be conveniently be resumed by the caller[,]'" (D.I. 71 at 17-18 (citing '054 patent,
col. 23:25-33)), does not appear to be materially different from Defendant's construction.

(emphasis added))

In light of the parties' arguments and representations at the claim construction hearing, the Court finds that there is no actual dispute regarding claim scope requiring action by the Court. Therefore, the Court recommends not construing these terms. *See Warner Chilcott Co., LLC*, 2013 WL 3336872, at *3.

### 15.   "tracking the audio and video capabilities associated with each workstation"

Defendant proposes that this term be construed to mean "[m]onitoring and storing the types of audio and video services available on each participant's workstation." (D.I. 63 at 11) Plaintiff offers no construction. (*Id.*) In its briefing, Plaintiff opposed Defendant's proposal on the grounds that it "substitut[es] less clear 'constructions' for the clear words of the claim term . . . by seek[ing] to: (1) replace 'tracking' with 'monitoring and storing'; (2) replace 'audio and video *capabilities*' with 'types of audio and video *services*'; (3) replace 'associated with' with 'available on'; and (4) add 'participant's' between 'each' and 'workstation.'" (D.I. 71 at 18-19 (emphasis in original))

At the *Markman* hearing, however, it became apparent that the main dispute was whether "tracking" also includes the concept of "storing." (Tr. at 256, 260-61; *see also id.* at 259 (Plaintiff's counsel noting that storing is a limitation that is "certainly encompassed in the word tracking . . . [i]t's just not requisite in the word tracking.")) For one, both Plaintiff and Defendant agreed that "tracking" included the concept of "monitoring[.]" (*Id.* at 256, 261) As to the other initially disputed areas other than the "storing" limitation, Plaintiff's counsel admitted that Plaintiff was not seriously objecting to these, except to the extent that the additions and

substitutions amounted to a re-wording of an otherwise clear claim phrase.  (Tr. at 256-57)

The term at issue appears in Claim 12 of the '762 patent, which is dependent on Claim 11. (D.I. 63 at 11)  Claim 12 recites: "The method of claim **11**, further comprising the steps of:  (a) *tracking the audio and video capabilities associated with each workstation*; and (b) processing a call, from a second to the first participant, based on which audio and video capabilities are associated with the first participant."  ('762 patent, col. 43:23-29 (emphasis added))  But any helpful evidence as to this dispute comes from the specification.

The specification first describes the concept of tracking in a subsection entitled "Multimedia Local Area Network[.]"  In this subsection, the specification describes the "preferred embodiment" illustrated in Figure 3.  (*Id.*, col. 6:61-63; *see also id.*, cols. 2:66-3:2 ("FIG. **3** is a block and schematic diagram of a preferred embodiment of a 'multimedia local area network' (MLAN) in accordance with a desktop collaboration system embodiment of the present invention."))  In describing this embodiment, the specification notes that "[w]hen one or more conferees are at distant locations, *the respective MLAN Servers 60* . . . communicate with one another via data paths so that each MLAN **10** contains updated information as to the capabilities of all the system CMWs **12**, and also the current locations of all parties available for teleconferencing."  (*Id.*, col. 9:4-14 (emphasis added))

In a subsection entitled, "MLAN Server Software" the specification describes Figure 21, which "diagrammatically illustrates software **62** comprised of various modules (as discussed above) provided for running on MLAN Server **60** (FIG. **3**) in the preferred embodiment."  (*Id.*, cols. 19:66-20:2)  Figure 21, in turn, indicates that one such server software module is the "AVNM" 63, which incorporates the "Service Server" 69.  (*Id.*, Fig. 21)  However, the

56

specification makes clear that "[i]t is . . . to be understood that, although the software illustrated in FIG. **21** offers various significant advantages, as will become evident hereinafter, *different forms and arrangements of software may also be employed within the scope of the invention*." (*Id.*, col. 20:3-7 (emphasis added); *see also id.*, col. 3:51-54 ("Brief Description of the Drawings" subsection indicating that "FIG. **21** illustrates software modules which *may* be provided for running on [the] MLAN Server in the MLAN of FIG. **3** for controlling operation of the AV and Data Networks.") (emphasis added)) The specification never provides any indication of what those different forms and arrangements might entail, nor whether they could dispense with the need for a Service Server and its corresponding functions.

In further describing the "Service Server" software module, the specification notes that:

> Before client programs can access audio/video resources through the AVNM, they must register the collaborative services they provide with the Service Server **69**. Examples of these services indicate "video call", "snapshot sharing", "conference" and "video file sharing." *These service records are entered into the Service Server's service database. The service database thus keeps track of the location of client programs and the types of collaborative sessions in which they can participate.* This allows the Collaboration Initiator to find collaboration participants no matter where they are located. The service database is replicated by all Service Servers: Service Servers communicate with other Service Servers in other MLANs throughout the system to exchange their service records.

(*Id.*, cols. 20:66-21:12 (emphasis added)) Accordingly, the specification explains that "[w]hen the Collaboration Initiator is started, it exchanges initial configuration information with the Audio Video Network Manager (AVNM) **60** (shown in FIG. **3**)" including information "indicating the location of the user, the types of services available on that workstation (e.g., videoconferencing, data conferencing, telephony, etc.) and other relevant initialization

information." (*Id.*, col. 18:50-57)  The specification goes on to describe how this information is

retrieved when a user attempts to place a call: "[t]he caller's Collaboration Initiator sends a

request to the AVNM to place a video call to caller with the specified address, as indicated by (5)

in FIG. **23**.  The AVNM *queries the Service Server to find the service instance of type 'video*

*call' whose name corresponds to the callee's address.*" (*Id.*, col. 22:3-7 (emphasis added))

In sum, although the specification describes, in detail, an embodiment wherein the audio

and video capabilities associated with each workstation are monitored and stored (in the Service

Server), the specification also makes it sufficiently clear that this is only a preferred embodiment,

and that the invention may be implemented in other ways utilizing, *inter alia*, differing software

modules.  In light of this, the Court finds inappropriate Defendant's attempt to limit the claim

term at issue to one particular embodiment.

In so concluding, the Court notes that this is not a case where the patentee "consistently

and exclusively" disclosed one embodiment in such a way as to indicate that the embodiment

was "clearly what the inventors of the [patent] conceived of." *Hologic, Inc. v. SenoRx, Inc.*, 639

F.3d 1329, 1335-36, 1338 (Fed. Cir. 2011) (limiting the invention to one particular concept

where the concept was "consistently and exclusively" disclosed in relation to a number of

examples in the specification).  Similarly, the patentee never clearly referred to the concept of

"storing" as *the* invention.[22]  Rather, as noted above, the patentee indicated that the embodiment

---

[22]     *Cf. Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006)
(holding that the claim term "fuel injection system component" was limited to "fuel filters[,]"
despite the fact that the claims contained no fuel filter limitation, because the fuel filter was "not
merely discussed as a preferred embodiment" as "[o]n at least four occasions, the written
description refers to the fuel filter as 'this invention' or 'the present invention'"); *Watts v. XL
Sys., Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000) (limiting a claim term to a particular embodiment
where there was only one embodiment described in the specification and the specification

was merely a preferred embodiment and that the invention could be implemented in other ways.

For the foregoing reasons, the Court finds that the term "tracking the audio and video capabilities associated with each workstation" should be construed to mean "monitoring the audio and video capabilities associated with each workstation."

### 16.   "video display device"

Defendant proposes that the term "video display device" be construed to mean "[a] monitor with a video display card." (D.I. 63 at 11)  Plaintiff opposes this construction arguing that the plain and ordinary meaning of the term should apply.  (*Id*; D.I. 71 at 18)  Initially, Plaintiff appeared to oppose Defendant's proposal on two grounds—whether a "video display device" requires (1) a "monitor" and (2) a video display card.  (Tr. at 270-71)

As to the first dispute, Plaintiff's opposition was grounded in its view that reference to a "monitor" excluded, for instance, a laptop, a television or a smart phone display.  (*Id*. at 270)  However, later at the *Markman* hearing, Defendant's counsel indicated that it did not intend its use of the term "monitor" to exclude these possibilities.  (*Id*. at 272-73)  Thus, the parties agreed that a video display device or monitor would be "some physical manifestation through which one can . . . display video[.]"  (*Id*. at 273; *id*. at 270-71 (Plaintiff's counsel agreeing that the term requires "some physical thing through which . . . video is displayed"))  However, with respect to the second issue—whether a video display device must have a "video display card"—the parties clearly had a disagreement.  (*Id*. at 272)

To resolve that dispute, the Court turns first to the claim language.  The claim term in question appears in Claim 33 of the '025 patent and Claim 10 of the '054 patent.  (D.I. 63 at 11)

referred to that embodiment as "[t]he present invention").

That claim language does not indicate one way or the other whether a "video display device"

must have a "video display card."

The Court then turns to the specification for further guidance. The Abstract first

describes that the capabilities of the claimed system "are achieved by exploiting a *variety of*

*hardware*, software and networking technologies in a manner that preserves the quality and

integrity of audio/video/data . . . ." ('025 patent, Abstract (emphasis added)) Next the

specification particularly describes the relevant hardware in a subsection entitled "Collaborative

Multimedia Workstation Hardware[.]" (*Id.*, col. 14:65) In that subsection, the specification

describes "*various preferred embodiments* of a CMW in accordance with the invention." (*Id.*,

col. 14:61-63 (emphasis added)) The subsection continues by stating that "*[o]ne embodiment* of

a CMW **12** of the present invention is illustrated in FIG. **18A**[.]" (*Id.*, col. 14:66-67 (emphasis

added)) Figure 18A in turn displays a "Monitor" connected to a CPU which contains a "Video

Display Card[.]" (*Id.*, Fig. 18A) The specification goes on to note, referring to Figure 18A, that

"[c]urrently available personal computers . . . and workstations . . . can be adapted to work with

the present invention[.]" (*Id.*, cols. 14:67-15:3) In this regard, the specification states that

"*currently available* personal computers and workstations [include, *inter alia*,] a video display

card **120** for displaying video . . . ." (*Id.*, col. 15:13-32 (emphasis added))

Thus, while the specification describes one embodiment of the invention, which includes

a "video display card[,]" its wording makes particularly clear that nothing therein limits the

invention to that embodiment. As such, the Court finds it inappropriate to import this limitation

into the claims. *See Northrop Grumman Corp.*, 325 F.3d at 1355; *Kara Tech.*, 582 F.3d at 1347-

48.[23]

Having resolved this dispute by determining that the limitation proposed by Defendant should not be imported into the meaning of "video display device[,]" and because the term's meaning otherwise appears clear, straightforward and undisputed, the Court finds that the term should be afforded its plain and ordinary meaning.

**B.    Conclusion**

For the foregoing reasons, the Court recommends that the District Court adopt the following constructions:

1.    "a first and a second set of potential participants" should be afforded its plain and ordinary meaning.

2.    "active states"/"active teleconference" should be afforded their plain and ordinary meaning.

3.    "addresses of video display devices" means "network locations of video display devices."

4.    "call handle" means "the primary data structure for managing connections that defines for an AV device, at least its connection status in relationship to a call with at least one other AV device."

5.    "conducting" should be should be afforded its plain and ordinary meaning.

---

[23]    The conclusion is the same even if the state of the technology at the time of filing did not permit video display devices to operate without video display cards. *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008) ("Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough."); *SuperGuide Corp.*, 358 F.3d at 878-80 (finding that the claim limitation "regularly received television signal" was broad enough to encompass digital signals even though no televisions that could receive digital signals existed as of the filing date).

6.    "controlling communication connections" should be afforded its plain and ordinary meaning.

7.    "displayed in two sets" means "simultaneously displayed in two sets."

8.    "initiate"/"initiating" should be afforded their plain and ordinary meaning.

9.    "managing a video conference" means "controlling the transfer of audio and video signals to and from the workstations associated with the first and second participants."

10.    "potential participants" means "users with workstations or portable computers who might participate in a teleconference."

11.    "quick dial list" means "a list of entries of potential participants that is a subset of the graphical rolodex."

12.    "selecting" means "providing by a user a choice of" and "selected" means "user-chosen."

13.    "teleconference" means "communication session that includes real-time audio and/or video conferencing."

14.    "on hold"/"hold state" should be afforded their plain and ordinary meaning.

15.    "tracking the audio and video capabilities associated with each workstation" means "monitoring the audio and video capabilities associated with each workstation."

16.    "video display device" should be afforded its plain and ordinary meaning.

## IV.   CONCLUSION

The Court recommends that the District Court adopt the constructions set out in Section

III.B above, for the reasons discussed in Section III.A above.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the

loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x

924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.

Dated: May 15, 2014

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE